# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

RODERICK R. DAVIDSON,

                                    Petitioner,

          v.

JERRY HOWELL, *et al.*,

                                    Respondents.

Case No. 2:14-cv-00551-APG-NJK

**ORDER DENYING PETITION**

## INTRODUCTION

Roderick Davidson, a Nevada prisoner, filed a petition for writ of habeas corpus under 28 U.S.C. § 2254. I will deny Davidson's habeas petition, deny him a certificate of appealability, and direct the Clerk of the Court to enter judgment accordingly.

## BACKGROUND

Davidson's convictions are the result of events that occurred in Clark County, Nevada on June 28 and 30, 2004. *See* Ex. 38, ECF No. 11-11. On June 28, 2004, Davidson went to the home of Robert Garvin, a neighbor of Davidson's parents. Ex. 27, ECF No. 11 at 14. Davidson knocked on Garvin's door, and when Garvin let him inside, Davidson battered Garvin and stole money and Garvin's vehicle. *Id.* at 15, 19. On June 30, 2004, Davidson was walking through a church parking lot when he came across a maintenance worker, Rulon Spencer. Ex. 27, ECF No. 11 at 80, 82. Davidson approached Spencer while he was in a church closet and asked him about employment. *Id.* at 85, 88. Davidson then battered Spencer and stole his wallet and vehicle. *Id.* at 89, 93.

Davidson was convicted by a state court jury of two counts of burglary, two counts of battery with substantial bodily harm, one count of robbery of a victim 60 years of age or older,

and one count of robbery without any aggravating element. Ex. 38, ECF No. 11-11. Davidson appealed. Ex. 39, ECF No. 11-12. The Supreme Court of Nevada affirmed in part and reversed in part, holding that one of the counts of robbery was a double-jeopardy violation and one of the counts of battery was a misdemeanor, not a felony, so Davidson was wrongly sentenced as a habitual criminal for that count. Ex. 44, ECF No. 12-3. Davidson petitioned for rehearing. Ex. 45, ECF No. 12-4. The Supreme Court of Nevada denied that petition. Ex. 46, ECF No. 12-5. On December 23, 2008, the state district court entered an amended judgment of conviction in accordance with the Supreme Court of Nevada's decision. Ex. 47, ECF No. 12-6. The Supreme Court of Nevada issued its remittitur on January 13, 2009. Ex. 49, ECF No. 12-8. Davidson's petition for en banc reconsideration was denied on January 20, 2009. Ex. 48, ECF No. 12-7; Ex. 50, ECF No. 12-9.

Davidson filed a post-conviction habeas corpus petition on October 16, 2009, which the state district court denied. Ex. 51, ECF No. 12-10; Ex. 57, ECF No. 12-16. Davidson appealed, and the Supreme Court of Nevada affirmed. Ex. 62, ECF No. 13-1. The remittitur issued on January 7, 2013. Ex. 63, ECF No. 13-2.

Davidson then filed two other motions in state district court. First, he moved for modification of sentence on April 15, 2013. Ex. 64, ECF No. 13-3. The court denied that motion on May 22, 2013. Ex. 68, ECF No. 13-7. Davidson did not appeal the denial of that motion. However, on June 10, 2013, while the time to appeal was still running, he filed a motion to correct an illegal sentence, which the state district court denied. Ex. 69, ECF No. 13-8; Ex. 72, ECF No. 13-11. Davidson appealed, and the Supreme Court of Nevada affirmed. Ex. 73, ECF No. 13-12. The remittitur issued on February 11, 2014. Ex. 74, ECF No. 13-13.

Davidson commenced this action by mailing his proper-person petition to this court on March 21, 2014. ECF No. 1. I appointed counsel, who filed an amended petition. ECF No. 9. Davidson's amended petition asserts the following grounds for relief:

1. The state district court improperly admitted inmate request/grievance forms into evidence.

2. Davidson was required to fill out inmate/request grievance forms, which were then used against him at trial.

3. The state district court improperly admitted unreliable, tainted, and unduly suggestive identifications.

4. The state district court improperly admitted Davidson's unreliable and involuntary confession.

5. The state district court improperly refused to sever the two cases.

6. There were cumulative errors at Davidson's trial.

7. Davidson's trial was not speedy.

8. Davidson's trial counsel was ineffective by:

    a. failing to object to the admission of the inmate request/grievance forms;

    b. failing to object to the flight instruction;

    c. failing to object to prosecutorial misconduct;

    d. failing to object to the reasonable doubt instruction; and

    e. cumulative errors committed by Davidson's trial counsel.

9. Davidson's appellate counsel was ineffective by:

    a. failing to include a ground in his direct appeal concerning the flight instruction;

    b. failing to include a ground in his direct appeal concerning prosecutorial misconduct;

    c. failing to include a ground in his direct appeal concerning the reasonable doubt instruction; and

d.  cumulative errors committed by Davidson's appellate counsel.

*Id.*  The Respondents filed a motion to dismiss. ECF No. 20.  On August 9, 2016, I granted the Respondents' motion to dismiss in part, finding Ground 6 to be unexhausted. ECF No. 34. Davidson moved for partial dismissal of Ground 6 from the amended petition, which I granted. ECF Nos. 35, 37.  The Respondents filed an answer to the amended petition on February 13, 2017. ECF. No. 44.  Davidson filed a reply on June 26, 2017. ECF No. 49.

**DISCUSSION**

**<u>Standard of Review</u>**

28 U.S.C. § 2254(d) sets forth the standard of review generally applicable in habeas corpus cases under the Antiterrorism and Effective Death Penalty Act ("AEDPA"):

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim --
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A state court decision is contrary to clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254, "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court." *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000), and citing *Bell v. Cone*, 535 U.S. 685, 694 (2002)).  A state court decision is an unreasonable application of clearly established Supreme Court precedent within the meaning of 28 U.S.C. § 2254(d) "if

4

the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 75 (quoting *Williams*, 529 U.S. at 413). "The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous. The state court's application of clearly established law must be objectively unreasonable." *Id.* (quoting *Williams*, 529 U.S. at 409-10) (internal citation omitted).

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). But "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 102 (citing *Lockyer*, 538 U.S. at 75); *see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (describing the standard as a "difficult to meet" and "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt" (internal quotation marks and citations omitted)).

Section 2254(d) generally applies to unexplained as well as reasoned state-court decisions. "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Harrington*, 562 U.S. at 99. When the state court has denied a federal constitutional claim on the merits without explanation, the federal habeas court

> must determine what arguments or theories supported or . . . could have
> supported, the state court's decision; and then it must ask whether it is possible
> fairminded jurists could disagree that those arguments or theories are inconsistent
> with the holding in a prior decision of [the United States Supreme] Court.

*Id.* at 102.

**Ground 1**

In Ground 1, Davidson claims that his federal constitutional rights were violated when the state district court admitted his inmate request/grievance forms into evidence. ECF No. 9 at 12. Davidson contends the admission of the forms prejudiced him, rendered the trial fundamentally unfair, and undermined the presumption of innocence. *Id.* at 13. He asserts that the forms should have been redacted, or the court should have at least given a limiting instruction. *Id.* The Respondents argue that the evidence was admitted only as a handwriting analysis, the substance of the forms was not discussed during trial, and the State had to revert to the use of the forms because Davidson refused to comply with the handwriting expert in providing samples. ECF No. 44 at 8.

This ground was raised in Davidson's direct appeal. Ex. 40, ECF No. 11-13 at 31. The Supreme Court of Nevada held that "the district court did not plainly err in admitting Davidson's inmate request/grievance forms." Ex. 44, ECF No. 12-3 at 4 n.1. As this ground was denied on the merits by the Supreme Court of Nevada without analysis, the question here is whether Davidson has shown that there was no reasonable basis for that ruling. *See Harrington*, 562 U.S. at 98.

Robert Garvin, one of the victims, testified that Davidson's mother, Gwendolyn Davidson, provided him with an apology letter written by Davidson. Ex. 27, ECF No. 11 at 13, 36-37; *see* Ex. 79, ECF No. 13-18. Rulon Spencer, the other victim, testified that he, too, received a letter from Davidson. Ex. 27, ECF No. 11 at 80, 101-104; *see* Ex. 80, ECF No. 13-19. Gwendolyn Davidson testified that Davidson gave the two apology letters to a good friend and that Gwendolyn later delivered those letters to the victims. Ex. 29, ECF No. 11-2 at 63, 70.

On February 10, 2005, the state district court granted the State's motion to compel a handwriting sample in order to compare Davidson's handwriting to the apology letters. Ex. 12, ECF No. 10-12. The state district court ordered Davidson "to give to representatives of the Las Vegas Metropolitan Police Department and/or the Clark County Detention Center's nursing staff samples of his handwriting" and that those thereafter be submitted "to the Crime Lab of the Las Vegas Metropolitan Police Department" for analysis. *Id.* Jan Seaman Kelly, a forensic document examiner, testified that she attempted to receive a writing exemplar from Davidson. Ex. 29, ECF No.11-2 at 24, 33. Kelly testified that Davidson was slow to start the handwriting sample process and that when he did start the sample, "the writing was very slow." *Id.* at 34. Kelly testified that Davidson's writing exemplar was not adequate, as it was not "considered natural writing" due to the time that Davidson "kept looking at the floor" and writing slowly. *Id.* at 34, 37. Kelly terminated the exemplar and requested a business writing. *Id.* at 37. Davidson's inmate request/grievance forms were provided to Kelly, and she "identified Roderick Davidson as the writer of both of the questioned letters." *Id.* at 37, 44.

Beverly Amin, an arrest supervisor at the jail who maintains inmate records, testified about inmate request/grievance forms, which are "call[ed] kites for short." Ex. 29, ECF No.11-2 at 11-13. Amin testified that

> [i]f an inmate has a request, they want something or a grievance or are upset about something, they have to fill out one of these forms and it's passed on to the person or persons who take care of it for them. And they answer – and the answer is given back to them on that same form.

*Id.* at 13. Davidson's inmate request/grievance forms were admitted into evidence without objection. *Id.* at 14.

Davidson's inmate request/grievance forms ranged from July 8, 2004 through April 10, 2005. Ex. 81, ECF No. 13-20. In those forms, it is apparent that Davidson wished to attend the following programs: narcotics anonymous, domestic violence, successful release, chemical dependency, anger management, and alcoholics anonymous. *Id.* at 3-6, 9-29, 31-50, 53. The inmate request/grievance forms also show that there was a fight in the jail in which Davidson had to be subdued, that Davidson's request to be transferred to a different tower was denied because he was not "write up free for 6 months," and that Davidson had never been incarcerated in Nevada before, implying that he had been incarcerated elsewhere. *Id.* at 8, 30, 51.

"A habeas petitioner bears a heavy burden in showing a due process violation based on an evidentiary decision." *Boyde v. Brown*, 404 F.3d 1159, 1172 (9th Cir. 2005), *as amended on reh'g*, 421 F.3d 1154 (9th Cir. 2005). "[C]laims deal[ing] with admission of evidence" are "issue[s] of state law." *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009); *see also Lewis v. Jeffers*, 497 U.S. 764 (1990) ("[F]ederal habeas corpus relief does not lie for errors of state law."). Therefore, the issue before me is "whether the state proceedings satisfied due process." *Jammal v. Van de Kamp*, 926 F.2d 918, 919-20 (9th Cir. 1991). In order for the admission of evidence to provide a basis for habeas relief, the evidence must have "rendered the trial fundamentally unfair in violation of due process." *Johnson v. Sublett*, 63 F.3d 926, 930 (9th Cir. 1995) (citing *Estelle v. McGuire*, 502 U.S. 62, 67 (1991)). Not only must there be "*no permissible inference the jury may draw from the evidence*," but also the evidence must "be of such quality as necessarily prevents a fair trial." *Jammal*, 926 F.2d at 920 (emphasis in original) (citation omitted).

Further, "[u]nder AEDPA, even clearly erroneous admissions of evidence that render a trial fundamentally unfair may not permit the grant of federal habeas corpus relief if not

forbidden by 'clearly established Federal law,' as laid out by the Supreme Court." *Yarborough*,

568 F.3d at 1101 (citing 28 U.S.C. § 2254(d)); *see also Dowling v. United States*, 493 U.S. 342,

352 (1990) (explaining that the Supreme Court has "defined the category of infractions that

violate 'fundamental fairness' very narrowly").  Importantly, the Supreme Court "has not yet

made a ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due

process violation sufficient to warrant issuance of the writ." *Id*.  The Supreme Court has also

declined to hold that evidence of other crimes or bad acts "so infused the trial with unfairness as

to deny due process of law." *Estelle*, 502 U.S. 62, 75 n.5 (1991); *see also Alberni v. McDaniel*,

458 F.3d 860 (9th Cir. 2006).

Although the inmate request/grievance forms included information that might indicate

Davidson may have had issues with addiction and violence, the forms were admitted for a

permissible purpose: showing the basis of the handwriting analysis expert's opinion that

Davidson wrote the two apology letters. *See Jammal*, 926 F.2d at 920.  And Davidson has not

established that this evidence is impermissible in a constitutional sense.  Regardless of whether

the evidence had a constitutionally permissible purpose, the admission of the forms was not "of

such quality as necessarily prevent[ed] a fair trial." *Jammal*, 926 F.2d at 920.  Accordingly, the

Supreme Court of Nevada's ruling was not contrary to, or an unreasonable application of, clearly

established federal law as determined by the Supreme Court, and was not based on an

unreasonable determination of the facts in light of the evidence. *See* 28 U.S.C. § 2254(d).  I will

deny Davidson habeas corpus relief with respect to Ground 1.

**Ground 2**

In Ground 2, Davidson claims that his federal constitutional rights were violated when he

was required to fill out the inmate request/grievance forms, which the State then used as

evidence against him. ECF No. 9 at 14. Davidson explains that he was never advised that the statements in the forms could be used against him or that he had the right to consult an attorney before communicating with state officials using the forms. *Id.* at 15. Davidson reasons that the lack of notice on the form suggests to the inmate that the form will remain a confidential internal document. ECF No. 49 at 14. The Respondents argue that Davidson has failed to establish that the forms had a substantial and injurious effect on the verdict. ECF No. 44 at 9.

This ground was raised in Davidson's direct appeal. Ex. 40, ECF No. 11-13 at 34. The Supreme Court of Nevada held that "the admission [of Davidson's inmate request/grievance forms] did not violate Davidson's Sixth Amendment right to counsel." Ex. 44, ECF No. 12-3 at 4 n.1. As this ground was denied on the merits by the Supreme Court of Nevada without analysis, the question here is whether Davidson has shown that there was no reasonable basis for the Supreme Court of Nevada's ruling. *See Harrington*, 562 U.S. at 98.

Although the Supreme Court of Nevada addressed this ground only in regards to Davidson's Sixth Amendment right to counsel, Davidson also argues that his Fifth Amendment protection against self-incrimination was also violated. *See* ECF No. 14; Ex. 40, ECF No. 11-13 at 34. The Respondents rely on precedent that "[t]he taking of [handwriting] exemplars d[oes] not violate [a] petitioner's Fifth Amendment privilege against self-incrimination." *Gilbert v. California*, 388 U.S. 263, 266 (1967). But Davidson's inmate request/grievance forms were used for handwriting comparison purposes, rather than a handwriting exemplar, so *Gilbert* is not directly applicable.

The privilege against self-incrimination "protects an accused only from being compelled to testify against himself, or otherwise provide the State with evidence of a testimonial or communicative nature." *Schmerber v. California*, 384 U.S. 757, 761 (1966). "[T]he protection

of the privilege reaches an accused's communications, whatever form they might take, and the compulsion of responses which are also communications, for example, compliance with a subpoena to produce one's papers." *Id.* at 763-64.  The distinction between what is considered privileged and what is not considered privileged "is that the privilege is a bar against compelling 'communications' or 'testimony,' but that compulsion which makes a suspect or accused the source of 'real or physical evidence' does not violate it." *Id.* at 764; *see also United States v. Euge*, 444 U.S. 707, 718 (1980) ("The compulsion of handwriting exemplars has been the subject of far less protection than the compulsion of *testimony and documents*." (emphasis added)); *Gilbert*, 388 U.S. at 266-67 ("A mere handwriting exemplar, *in contrast to the content of what is written*, like the voice or body itself, is an identifying physical characteristic outside [the Fifth Amendment's] protection." (emphasis added)).  Therefore, the issue at hand is whether the inmate request/grievance forms was merely used for the "real or physical" handwriting contained within them or whether they were used as communications by Davidson.

The Supreme Court has explained that "compelling [a defendant] to speak within hearing distance of the witnesses, even to utter words purportedly uttered by the robber, was not compulsion to utter statements of a 'testimonial' nature; he was required to use his voice as an identifying physical characteristic, not to speak his guilt." *United States v. Wade*, 388 U.S. 218, 222-23 (1967) (explaining that the privilege against self-incrimination turns on the "compulsion of the accused to give evidence having testimonial significance," in other words, "compulsion to disclose any knowledge he might have").  Similarly, the inmate request/grievance forms were used to identify a physical characteristic—Davidson's handwriting—not to demonstrate his guilt. In fact, the forms discuss only Davidson's wishes to attend classes for addiction and violence, the fact that there was a fight in the jail, and that Davidson was ineligible for a transfer. *See* Ex.

81, ECF No. 13-20. The forms do not discuss the facts of the crimes and especially do not discuss Davidson's guilt thereof. Further, when the State introduced the forms and offered them into evidence, the State and the State's witnesses did not touch upon the contents of the forms; rather, they discussed only the handwriting on the forms. *See* Ex. 29, ECF No. 11-2 at 11-14, 37-49; *see also Wade*, 388 U.S. at 223 ("[T]his case presents no question of the admissibility in evidence of anything [the defendant] said or did at the lineup which implicates his privilege. The Government offered no such evidence as part of its case, and what came out about the lineup proceedings on [the defendant's] cross-examination . . . involved no violation of [the defendant's] privilege.").

Because the inmate request/grievance forms were admitted only to identify Davidson's handwriting, I cannot find that Davidson's Fifth Amendment privilege against self-incrimination was violated. And because the State did not elicit any incriminating statements from Davidson, Davidson's Sixth Amendment right to counsel was also not violated. *See Massiah v. United States*, 377 U.S. 201, 206 (1964); *Randolph v. California*, 380 F.3d 1133, 1143 (2004). Therefore, the Supreme Court of Nevada's ruling was not contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, and was not based on an unreasonable determination of the facts in light of the evidence. *See* 28 U.S.C. § 2254(d). I will deny Davidson habeas corpus relief with respect to Ground 2.

**Ground 3**

In Ground 3, Davidson claims that his federal constitutional rights were violated when the state district court admitted unreliable, tainted, and unduly suggestive identifications. ECF No. 9 at 16. Davidson explains that neither Garvin nor Spencer had ample opportunity to view the assailant at the time of the crime, demonstrated a high level of detailed accuracy in their

initial descriptions of the assailant, and successfully identified Davidson as the assailant during initial photographic lineups. ECF No. 49 at 23. Davidson also explains that the victim's later identifications were tainted by their receipt of apology letters. ECF No. 9 at 16. The Respondents argue that Davidson had every opportunity to cross-examine both victims about the issues of mistaken identity. ECF No. 44 at 10.

This ground was raised in Davidson's direct appeal. Ex. 40, ECF No. 11-13 at 37. The Supreme Court of Nevada held that "the identification procedures were not suggestive or unduly tainted." Ex. 44, ECF No. 12-3 at 4 n.1. As this ground was denied on the merits by the Supreme Court of Nevada without analysis, the question here is whether Davidson has shown that there was no reasonable basis for that ruling. *See Harrington*, 562 U.S. at 98.

Garvin was given a photo lineup following the attack. *See* Ex. 76, ECF No. 13-15. Garvin indicated the following:

> I am unable to identify any of the pictures right now – I only got a brief look when he knocked. He said his name was Anthony[;] called me by name [and] made a pretext of getting in touch with his parents who I know very well. I believed that he was the son of my two friends across the street (neighbors) Gywnn [sic] [and] Elbert.
>
> After looking at the photos again, I recognize #2 as the man who assaulted me – he had a blue [and] white sports jersey on.

*Id.* at 3.

Garvin later testified at the preliminary hearing that he "heard a knock at the door" and "saw [his] neighbor's son." Ex. 3, ECF No. 10-3 at 4-5. Garvin did not know Davidson's name at that time and could not remember what name the assailant gave him before the attack began. *Id.* at 6, 8. Garvin had never been formally introduced to Davidson, but he "had spoken to him

from like across the street a couple of times" for "[a] few minutes." *Id.* at 6-7. Garvin identified

Davidson during the preliminary hearing as the person who battered him. *Id.* at 5.

Garvin testified at Davidson's trial that he was at home watching television when he

heard a knock on his door. Ex. 27, ECF No. 11 at 14. The individual at his door had a medium

build, dark brown skin, and was in his mid-thirties. *Id.* at 27. Garvin recognized the individual as

being his neighbor's son. *Id.* He testified that he could not recall his name and that he had never

been formally introduced to him although he had had minor interactions with him. *Id.* at 16-17,

28. After Garvin opened his door, the individual "hit [Garvin] with both arms extended and

knocked [Garvin] back against the door, and then after that he got [him] in a headlock and

dragged [Garvin] around the house looking for the money and car keys." *Id.* at 18. The

individual then took Garvin's money and his car. *Id.* at 19. Garvin identified Davidson during

the trial as being the assailant. *Id.* at 29.

Garvin had no recollection of anything that happened after the attack until the EMTs

arrived. *Id.* at 30-31. In fact, he did not remember making a 911 call. *Id.* at 30. Garvin was

shown a photo lineup and was unable to pick out the assailant right away because he "was a little

fuzzy" and "just got to look at [the assailant], you know, for a fleeting second really." *Id.* at 34-

36. When asked why he was so sure that Davidson was the individual who attacked him, Garvin

testified "[h]e sent me a letter of apology a few days later. His mom brought it over to me." *Id.*

at 36. Garvin later clarified that the letter was how he "knew definitely it was [Davidson]." *Id.* at

46. Garvin was then asked about his 911 call:

> Q    Mr. Garvin, is it fair to say that when you called the 9-1-1 operator you
>      couldn't identify who this person was?
>
> A    Well I think that I can't remember what happened after I came to. I
>      remember opening the door for him and remember who I saw standing
>      there; and that's the reason I let him in because it was my neighbor's son.

14

| | Q | At the time that you were talking to 9-1-1, I know that you had just been attacked. By the time you were talking to them you were unable to identify who it was. |
|---|---|---|

Q      At the time that you were talking to 9-1-1, I know that you had just been attacked. By the time you were talking to them you were unable to identify who it was.

A      Yeah.

*Id.* at 42. Garvin was then asked about his statement to the police:

Q      Okay; and during your voluntary statement to the police at the hospital later that day, they asked you: Would you recognize this person if you saw him again? Right?

A      Yeah.

Q      And your answer to them was: It's hard to say; maybe.

A      Yeah. Yeah.

Q      Okay; and you said to them you're not really sure what the fellow across the street looks like.

A      Well, more or less.

Q      Okay; and that you've never really seen him up close.

A      No.

Q      Okay; and actually you believe that a young fellow – your own words – there's a young fellow that I think has been staying across the street.

A      Yeah.

Q      Okay; and when they asked you about any interaction you may have had with that young fellow, you said that you had one conversation with him from across the way.

A      Yeah. Yeah, and we'd say hi back and forth when I'd see him, you know.

Q      Okay, but there wasn't any great interaction with you and Roderick Davidson?

A      No.

| | | |
|---|---|---|
| Q | | Then you were given a photo lineup the day after, while you were in the hospital. Do you remember that? |
| A | | Right. |
| Q | | And at the time, your first – your initial statement to the police was that you were unable to identify any of the people in the pictures. |
| A | | Yes. |
| Q | | And that you only got a brief look at the person when he knocked on the door? |
| A | | Well the pictures weren't that good. That's what was giving me a little bit of a problem. It was hard to distinguish. |

*Id.* at 42-44.

Turning to Spencer, he testified that he saw a black male between the ages of 25 and 30 who was about six feet tall walking in the parking lot of the church. Ex. 27, ECF No. 11 at 80, 82-83. Spencer was in a "little closet on the northwest corner of the building" when "the individual walked up and stepped inside the door, and . . . asked [him] for a job." *Id.* at 85, 88. Spencer responded that he did not have a job for him, and "[a]t that point he turned around, took one step away from [Spencer] like if he's going to leave and then he swung around real quick and with his right first he punched [Spencer] in the face." *Id.* at 89. The punch knocked Spencer down, and then the individual "c[a]me on top of [Spencer] and started beating [Spencer] with his right fist." *Id.* at 90. The individual took Spencer's wallet, left the closet, and took Spencer's truck. *Id.* at 93. At the trial, Spencer identified Davidson as the individual who battered him. *Id.* at 99-100. Prior to the preliminary hearing, Spencer received a letter, which he gave to a prosecutor. *Id.* at 101-03. The prosecutor opened the letter and indicated that it "was a letter from the individual that assaulted [Spencer]." *Id.*

Spencer testified that, while he was still in the hospital, he had been given a photo lineup following the attack. *Id.* at 111-113.  He testified that he "wasn't sure" whether the assailant was one of the people in the lineup. *Id.* at 111.  He picked out the person in the fifth spot, who was "Brown, Wade DeYoung." *Id.* at 111, 113.  Spencer testified that he had previously picked out Davidson at the preliminary hearing "[b]ecause [he] recognized his features.  [He] recognized that that was the individual that had actually attacked [him]." *Id.* at 113-14; *see also* Ex. 3, ECF No. 10-3 at 8, 10 (identification by Spencer of Davidson as the assailant at the preliminary hearing).  Spencer clarified that "[t]here's something about his physical facial feature that struck [him] real strong and [he] knew with no doubt that that was him." Ex. 27, ECF No. 11 at 114.  Spencer testified that he was one hundred percent sure that Davidson is the man that battered him. *Id.*

"To constitute a due process violation, the photographic identification procedure must be so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Denham v. Deeds*, 954 F.2d 1501, 1504 (9th Cir. 1992); *see also Simmons v. United States*, 390 U.S. 377, 384 (1968) (holding that "convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification").  Determining whether a pretrial identification procedure violates a suspect's due-process rights is a two-step inquiry. *United States v. Love*, 746 F.2d 477, 478 (9th Cir. 1984).  "First, it must be determined whether the procedures used were impermissibly suggestive.  If so, it must then be determined whether the identification was nonetheless reliable." *Id.*  In determining the likelihood of misidentification, the following factors are considered:

the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

*Neil v. Biggers*, 409 U.S. 188, 199-200 (1972).

Turning first to Garvin's identification of Davidson, Garvin was given a photo lineup following the attack, and while he was unable to identify Davidson initially, he picked Davidson out "[a]fter looking at the photos again." Ex. 76, ECF No. 13-15 at 3. Davidson appears to argue that Garvin's later identification of Davidson was tainted by "unnecessarily suggestive procedures." ECF No. 49 at 22. It is unclear why Garvin changed his mind about being able to identify his assailant after looking at the lineup again. However, to the extent that impermissibly suggestive procedures were used, I will assess whether Garvin's identification of Davidson was "nonetheless reliable." *Love*, 746 F.2d at 478.

Most of the *Biggers* factors indicate that Garvin's identifications of Davidson were reliable. First, although it was brief, Garvin had an opportunity to view the assailant at the time of the crime and to identify him as an individual he had met before. In his statement following the photo lineup, during the preliminary hearing, and during the trial, Garvin maintained that he believed the assailant was his neighbors' son. *See* Ex. 76, ECF No. 13-15 at 3; Ex. 3, ECF No. 10-3 at 4-5; Ex. 27, ECF No. 11 at 27. Second, Garvin's degree of attention was appropriate: at trial, Garvin was able to describe his assailant's build, skin color, and approximate age. Ex. 27, ECF No. 11 at 27. Garvin was also able to describe what the assailant was wearing following the photo lineup: "a blue [and] white sports jersey." Ex. 76, ECF No. 13-15 at 3. Third, because his initial statement to the police was during the photo lineup, this factor—the accuracy of his prior descriptions of the assailant—is inapplicable. Fourth, the level of certainty given by Garvin at

the confrontation was somewhat weak in that Garvin was initially "unable to identify any of the pictures." *Id.* Fifth, the length of time between the battery and the confrontation was brief; the photo lineup was conducted the following day. *See id.*

Although Garvin's level of certainty during the photo lineup was somewhat lacking, he was consistent that the assailant was his neighbors' son. Accordingly, after assessing the totality of the circumstances, I cannot conclude that Garvin's identification violated Davidson's right to due process. *See Manson*, 432 U.S. at 116 ("Surely, we cannot say that under all the circumstances of this case there is 'a very substantial likelihood of irreparable misidentification.'" (citation omitted)). Importantly, Davidson's trial counsel was able to cross-examine Garvin on any possible misidentification issues. Davidson's trial counsel questioned Garvin about the fact that he could not identify the assailant during the 911 call, that Garvin had not seen his neighbors' son up close, and that Garvin "definitely" knew that Davidson was the assailant only after "his mother brought the [apology] letter over." Ex. 27, ECF No. 11 at 42-43, 46. *See Simmons v. United States*, 390 U.S. 377, 384 (1968) ("The danger that use of the technique [of using photographs for initial identification] may result in convictions based on misidentification may be substantially lessened by a course of cross-examination at trial which exposes to the jury the method's potential error."); *see also Manson v. Brathwaite*, 432 U.S. 98, 116 (1977) ("Juries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature.").

Turning next to Spencer's identification of Davidson, Spencer did not pick Davidson from the photo lineup. Ex. 27, ECF No. 11 at 80, 111, 113. Instead, he identified Davidson at both the preliminary hearing and the trial. *See id.* at 99-100; Ex. 3, ECF No. 10-3 at 8, 10. "The due process check for reliability . . . comes into play *only* after the defendant establishes

improper police conduct." *Perry v. New Hampshire*, 565 U.S. 228, 241 (2012) (emphasis added).

Because Spencer did not pick Davidson from the photo lineup, there was no improper police

conduct, so the reliability of Spencer's identification of Davidson "falls within the province of

the jury" and is simply tested "through the rights and opportunities generally designed for that

purpose, notably, the presence of counsel at postindictment lineups, vigorous cross-examination,

protective rules of evidence, and jury instructions on both the fallibility of eyewitness

identification and the requirement that guilt be proved beyond a reasonable doubt." *Id.* at 232-33;

*see also United States v. Domina*, 784 F.2d 1361, 1368 (9th Cir. 1986) ("When the initial

identification is in court, . . . [t]he jury can observe the witness during the identification process

and is able to evaluate the reliability of the initial identification."). Because there is no

requirement for a trial court to screen eyewitness evidence for reliability to evaluate whether a

due process violation has occurred when "the identification was not procured under

unnecessarily suggestive circumstances arranged by law enforcement," *Perry*, 565 U.S. at 248,

Davidson's argument that his right to due process was violated by the state district court's

admission of Spencer's identification lacks merit.

Because Garvin's identification did not violate Davidson's right to due process and

Spencer's identification did not implicate due process concerns, the Supreme Court of Nevada's

ruling was not contrary to, or an unreasonable application of, clearly established federal law as

determined by the Supreme Court of the United State, and was not based on an unreasonable

determination of the facts in light of the evidence. *See* 28 U.S.C. § 2254(d). I will deny

Davidson habeas corpus relief with respect to Ground 3.

/ / / /

/ / / /

**Ground 4**

In Ground 4, Davidson claims that his federal constitutional rights were violated when the state district court admitted his unreliable and involuntary confession, which was given after his rights were involuntarily waived. ECF No. 9 at 19, 21. Specifically, Davidson argues that he was noticeably sleepy, coming down from being on narcotics, was suffering from mental illness, and was in a drug-induced psychosis. *Id.* at 21. This ground was raised in Davidson's direct appeal. Ex. 40, ECF No. 11-13 at 39. The Supreme Court of Nevada held that "Davidson's confession was voluntary and the police did not violate his constitutional rights in obtaining the statement." Ex. 44, ECF No. 12-3 at 4 n.1. As this ground was denied on the merits by the Supreme Court of Nevada without analysis, the question here is whether Davidson has shown that there was no reasonable basis for that ruling. *See Harrington*, 562 U.S. at 98.

Davidson moved to suppress his statements to the police. *See* Ex. 16, ECF No. 10-16. The motion included transcripts of his two interviews with detectives. *See id.* at 14-43. The first interview occurred on July 3, 2004, at 3:00 a.m. with Detective Kyle Toomer. *Id.* at 14. In the interview, Davidson stated that he read and understood his *Miranda* rights. *Id.* at 15. Davidson then explained that on June 28, 2004, he went to his parents' neighbor's house, knocked on the door, pushed the individual, "Mr. Bob," down and "began aggressively attacking" him. *Id.* at 16-17. Davidson then explained that he took "Mr. Bob's" car and left it "at some projects." *Id.* at 17. Davidson's focus was on "[g]etting high." *Id.* at 18. The second interview occurred the same night, July 3, 2004, at 4:50 a.m. with Detective Caldwell. *Id.* at 26. Davidson stated that he understood that his "Miranda rights still apply." *Id.* at 27. He explained that he "was lookin' for a place to lay [his] head so [he] came across this church." *Id.* at 28. Davidson encountered an individual at the church, and Davidson pushed and punched him. *Id.* at 28, 30. Davidson then

took his wallet and keys. *Id.* at 31. During the second interview, Davidson stated that he did not even know what the current day was, that he was "twisted in [his] mind," and that he used the money he stole to buy crack cocaine. *Id.* at 33, 36, 38.

Davidson's motion also included two psychological reports from Greg Harder, Psy.D. *See id.* at 45-53. Dr. Harder evaluated Davidson on February 22, 2005, and September 7, 2005. *Id.* at 45, 50. Following his first evaluation, Dr. Harder concluded:

> Mr. Davidson has a severe drug problem and is not functioning well at this time. His thoughts were disjointed and he was unable to answer all my questions without some assistance. However, he does understand his charges and potential consequences for those charges. He is also able to communicate in a rational manner, and should be able to assist counsel. My impression is that he is competent to stand trial, but is suffering from an amphetamine induced psychosis, or has brain damage from 23 years of exposure to meth. He described himself as in pain and needing to take drugs, and does not feel he can function without them. He is clearly impaired, but is not so impaired that he would be considered incompetent.

*Id.* at 47. Following his second evaluation, Dr. Harder recommended:

> Mr. Davidson's impaired mental states at the time of the criminal event and confession to the police should be considered in the defense of his case. While he clearly incriminated himself at the time of the interview, it seems unlikely that he had the mental capacity to make such statements rationally based on his mental confusion, inability to speak continuously, poor memory, and hallucinations at the time. It is highly questionable whether Mr. Davidson's verbal statement was influenced by other parties. He was in the state of mind from an amphetamine induced psychosis where he could have been easily misled, or unable to provide details at all.

*Id.* at 52.

An evidentiary hearing was held on Davidson's motion. *See* Ex. 22, ECF No. 10-22. Detective Kyle Toomer testified that he received a phone call from Davidson turning himself in to the police around 3:00 a.m. on July 3, 2004. *Id.* at 4, 5; *see also* Ex. 29, ECF No. 11-2 at 63, 66-68 (testimony of Gwendolyn Davidson, Davidson's mother, at trial in which she explained

that Davidson called her on July 3, 2004, that she initiated a three-way call with Davidson and

Detective Toomer, and that during that phone call Davidson was talking very slow and did not

sound like himself). Detective Toomer met Davidson at a bus station, put him in his vehicle, and

took him to the police station. Ex. 22, ECF No. 10-22 at 6. Detective Toomer indicated that

Davidson's "appearance was normal for a person who calls at three in the morning and stated he

was tired; tired, in fact, of running from us. But he appeared normal." *Id.* Davidson was not

slurring his speech, was articulate, and did not show any signs of being high or intoxicated. *Id.* at

6, 9. During the drive to the police station, Davidson was voluntarily giving information and

"telling his part." *Id.* at 9. Davidson was read his *Miranda* rights once they arrived at the

station.[1] *Id.* at 6-7.

      Detective Stephen Caldwell testified that he interviewed Davidson after Davidson's

interview with Detective Toomer. *Id.* at 10, 11. Detective Caldwell's interview took place at

---

[1] Detective Toomer's testimony was similar at trial: he received a phone call from Davidson at 3:00 a.m. on July 3, 2004, and Davidson "told [Detective Toomer] that he wanted to turn himself in." Ex. 28, ECF No. 11-1 at 37, 43. Detective Toomer picked Davidson up, handcuffed him, and put him in his vehicle. *Id.* at 44. On the way to the police station, Davidson volunteered information, but Detective Toomer was not questioning him at that time. *Id.* at 45. Detective Toomer testified that Davidson "wasn't too tired" and "appear[ed] normal" with no signs of being intoxicated. *Id.* at 48. Davidson had no issue understanding Detective Toomer's questions. *Id.* at 49.

      The only discrepancy between Detective Toomer's testimony at the evidentiary hearing and the trial regarded the timing of the reading of Davidson's *Miranda* rights. At the evidentiary hearing Detective Toomer testified that Davidson was read his *Miranda* rights "when [Detective Toomer] got him in the car." Ex. 22, ECF No. 10-22 at 10. However, at trial, Detective Toomer testified that Davidson did not read him his *Miranda* right until they were in the interview room at the police station. Ex. 28, ECF No. 11-1 at 45-46.

      Because Davidson's statements made during the ride from the bus station to the police station were given voluntarily without questioning from Detective Toomer, *see Miranda v. Arizona*, 384 U.S. 436, 444 (1966) (explaining that there is no custodial interrogation without "questioning initiated by law enforcement officers"), it is immaterial to this analysis whether the reading of his *Miranda* rights occurred when Davidson was put in the vehicle at the bus station or after he arrived at the police station.

4:50 a.m. on July 3, 2004. *Id.* Davidson was not readvised of his *Miranda* rights. *Id.* Detective

Caldwell described Davidson as being alert, answering the questions in a manner that made

sense, and giving specific answers.[2] *Id.*

Dr. Greg Harder also testified at the evidentiary hearing. *Id.* at 13. After testifying about

his evaluations of Davidson, the judge questioned Dr. Harder:

> THE COURT: Okay. So how is that you think that when he can respond quickly, when he can respond without having to have anybody finish his sentences for him and when he provides details which, in fact, are accurate, that he is suffering from psychosis to the extent that he doesn't know what he's doing?
>
> THE WITNESS: That's a hard question for me to answer.
>
> THE COURT: I would think.
>
> THE WITNESS: And, you know, I – I can't really know the answer to that.
>
> All I can say is that he does show some signs of psychosis and it's possible that his psychotic state waxes and wanes during the course of the illness.
>
> THE COURT: But at the time of this second interview, which is the easy one to hear, he appeared pretty articulate and cogent, didn't he?
>
> THE WITNESS: I believe so, yes.
>
> THE COURT: And knew a lot of details, didn't he?
>
> THE WITNESS: I believe so.
>
> THE COURT: And if those details happened to be accurate and not known to anybody but the person, I mean, was there anything about that interview, other than this occasional statement, you know, I'm sorry, I'm twisted –

---

[2] Detective Caldwell's testimony was similar at trial. *See* Ex. 29, ECF No. 11-2 at 51. He testified that Davidson did not appear to be intoxicated, that he seemed tired, and that "[h]e seemed to understand [the questions being asked] and was able to independently recall things." *Id.* at 59.

| | |
|---|---|
| THE WITNESS: | Right. |
| THE COURT: | -- that would indicate that he didn't understand the questions, he didn't know what he was doing and he wasn't voluntarily telling the truth, anything about that? |
| THE WITNESS: | I can't – I can't give any more information than that. I think you are right on that. |

*Id.* at 17-18. Thereafter, the judge found that Davidson "knew what he was doing and he wasn't under psychosis." *Id.* at 19. The judge ruled Davidson's statement to be voluntary and admissible. *Id.*

To the extent that Davidson argues that his waiver of rights was involuntary, a "defendant may waive effectuation of [his or her] rights, provided the waiver is made voluntarily, knowingly, and intelligently." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). There are two dimensions to determining whether a waiver of one's constitutional privilege is coerced:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

*Moran v. Burbine*, 475 U.S. 412, 421 (1986) (internal quotation and citation omitted). During his interview with Detective Toomer, Davidson stated that he was read and understood his *Miranda* rights. Ex. 16, ECF No. 10-16 at 15; *see also* Ex. 22, ECF No. 10-22 at 6-7 (testimony of Detective Toomer that Davidson was read his *Miranda* rights once they arrived at the police station). Davidson also stated that he understood that his "Miranda rights still apply" at the beginning of his interview with Detective Caldwell. Ex. 16, ECF No. 10-16 at 27. There is no

evidence to suggest that Davidson's waiver of his rights was anything by voluntary, knowing, and intelligent.

Turning next to the confession, the admission into evidence at trial of an involuntary confession violates a defendant's right to due process under the Fourteenth Amendment. *Lego v. Twomey*, 404 U.S. 477, 478 (1972); *Brown v. Horell*, 644 F.3d 969, 979 (9th Cir. 2011); *see also Dickerson v. United States*, 530 U.S. 428, 444 (2000) (explaining that the requirement that *Miranda* rights be given prior to a custodial interrogation does not dispense with a due process inquiry into the voluntariness of a confession). "A confession is involuntary if it is not 'the product of a rational intellect and a free will.'" *Brown*, 644 F.3d at 979 (quoting *Medeiros v. Shimoda*, 889 F.2d 819, 823 (9th Cir. 1989)). To determine whether a confession was involuntary, a court must consider the totality of the circumstances. *See Withrow v. Williams*, 507 U.S. 680, 693 (1993); *Brown*, 644 F.3d at 979. The circumstances the court is to consider include: the element of police coercion; the length, location, and continuity of the interrogation; the defendant's maturity, education, physical condition, and mental health; whether the defendant was advised of his rights; and whether counsel was present. *See Withrow*, 507 U.S. at 693-94.

First, there does not appear to be any coercion from the police here. In fact, Davidson wanted to turn himself in and contacted the police through his mother. *See* Ex. 22, ECF No. 10-22 at 5; Ex. 29, ECF No. 11-2 at 66-68. Second, the length and the location of the interrogations were not suspect. The interview with Detective Toomer lasted only 20 minutes, and the interview with Detective Caldwell lasted only 15 minutes. *See* Ex. 16, ECF No. 10-16 at 14-43. With regard to continuity, there was an hour and a half break between the first and second interview. *See id.* However, this break was due only to Detective Caldwell needing time to come

to the police station after learning that Davidson had turned himself in. Ex. 29, ECF No. 11-2 at 55.  Next, Davidson's age and education level were not concerning: he was 37 at the time of the crimes, and he graduated twelfth grade. Ex. 5, ECF No. 10-5 at 3.  Further, although he did not have counsel present, Davidson was advised of his rights. *See Id.*

Davidson's argument that his confession was not voluntary centers primarily on his physical condition and mental health at the time of the interrogations.  There was testimony that Davidson was tired. *See* Ex. 22, ECF No. 10-22 at 6.  There was testimony from Davidson's mother that Davidson was talking very slowly and did not sound like himself the night of the interrogation. *See* Ex. 29, ECF No. 11-2 at 66-68.  Finally, there was testimony by Dr. Harder that Davidson was suffering from an amphetamine-induced psychosis at the time of the interrogation. *See* Ex. 16, ECF No. 10-16 at 47, 52 (conclusion by Dr. Harder that "it seems unlikely that [Davidson] had the mental capacity to make such statements rationally based on his mental confusion").

On the other hand, Detective Toomer testified that Davidson appeared normal, was not slurring his speech, was articulate, and did not show any signs of being high or intoxicated. Ex. 22, ECF No. 10-22 at 6, 9.  Detective Caldwell also testified that Davidson was alert, answered questions in a manner that made sense, and gave specific answers. *Id.* at 11.  Davidson was specific about the attacks against Garvin and Spencer. *See* Ex. 16, ECF No. 10-16 at 16-18, 28, 30-31 (explaining how he knew Garvin, how he battered Garvin, what items he took from Garvin's residence, how he came upon Spencer, how he battered Spencer, and what items he took from Spencer).  And importantly, the state district court, through its questions to Dr. Harder, pointed out that Davidson was articulate and cogent during the interrogations, that he knew a lot of details of the crimes, and that he was able to respond quickly. Ex. 22, ECF No. 10-22 at 17-

18.  Based on the totality of the circumstances, especially a lack of sufficient evidence that Davidson's mental health was suffering at the time of the interrogation, I cannot determine that Davidson's confession was involuntary. *Withrow*, 507 U.S. at 693.  Therefore, the Supreme Court of Nevada's ruling was not contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, and was not based on an unreasonable determination of the facts in light of the evidence. *See* 28 U.S.C. § 2254(d).  I will deny Davidson habeas corpus relief with respect to Ground 4.

**<u>Ground 5</u>**

In Ground 5, Davidson claims that his federal constitutional rights were violated when the state district court refused to sever the two cases. ECF No. 9 at 22.  Davidson explains that the two incidents were not part of a common plan or scheme, there was no factual nexus between the two incidents, one robbery would not be admissible as prior bad act evidence in the other robbery if the cases were severed, it would not be a burden to hear the cases separately as each trial would be short, and there is prejudice hearing the cases together. *Id.*  The Respondents argue that the two incidents were sufficiently similar to establish a common scheme and permit cross-admissibility. ECF No. 44 at 12.

This ground was raised in Davidson's direct appeal. Ex. 40, ECF No. 11-13 at 42.  The Supreme Court of Nevada held that "the district court did not abuse its discretion in refusing to sever Davidson's trial." Ex. 44, ECF No. 12-3 at 4 n.1.  As this ground was denied on the merits by the Supreme Court of Nevada without analysis, the question here is whether Davidson has shown that there was no reasonable basis for that ruling. *See Harrington*, 562 U.S. at 98.

Davidson moved to sever counts five through eight, which involved the incident with Spencer, from counts one through four, which involved the incident with Garvin. *See* Ex. 15,

ECF No. 10-15.  At the hearing on the motion, the state court judge denied severance after finding that "the letters connect these cases enough that—to have them together." *Id.* at 3. *See* Ex. 21, ECF No. 10-21 at 2-4.  Moreover, during the evidentiary hearing held on Davidson's motion to suppress, the judge indicated again that the motion to sever was denied because the apology letters are cross-admissible and tied the two incidents together. Ex. 22, ECF No. 10-22 at 19-20.

"Improper joinder does not, in itself, violate the Constitution.  Rather, misjoinder would rise to the level of a constitutional violation only if it results in prejudice so great as to deny a defendant his Fifth Amendment right to a fair trial." *United States v. Lane*, 474 US 438, 466 n.8 (1986).  Therefore, to prevail, Davidson "bears the burden of demonstrating that the state court's denial of his severance motion rendered his trial 'fundamentally unfair.'" *Grisby v. Blodgett*, 130 F.3d 365, 370 (9th Cir. 1997).  Davidson has not established that his trial was fundamentally unfair by joinder of the charges regarding Garvin and the charges regarding Spencer.  Rather, the two incidents have numerous similarities: Davidson approached both victims innocuously, battered both victims, stole Garvin's money and Spencer's wallet, and then stole both victims' vehicles. Ex. 3, ECF No. 10-3 at 4-5, 18-19; Ex. 16, ECF No. 10-16 at 16-17, 28, 30-31; Ex. 27, ECF No. 11 at 85, 88, 90, 93.

Moreover, the Ninth Circuit has held that the above-mentioned footnote in *Lane* is dicta and does not set forth clearly established law binding on the states on federal habeas review. *See Runningeagle v. Ryan*, 686 F.3d 758, 776-77 (9th Cir. 2012) ("Lane do[es] not 'establish a constitutional standard binding on the states.'" (citing *Collins v. Runnels*, 603 F.3d 1127, 1131 (9th Cir. 2010)).  Due to the controlling Ninth Circuit authority, the Supreme Court of Nevada's ruling was not contrary to, or an unreasonable application of, clearly established federal law as

1 determined by the Supreme Court of the United States, and was not based on an unreasonable

2 determination of the facts in light of the evidence. *See* 28 U.S.C. § 2254(d).  I will deny

3 Davidson habeas corpus relief with respect to Ground 5.[3]

4 **Ground 7**

5      In Ground 7, Davidson claims that his federal constitutional rights were violated when his

6 trial date was delayed. ECF No. 9 at 23.  The Respondents argue that the delay was not

7 uncommonly long, that various reasons contributed to the delay, and that Davidson fails to show

8 prejudice. ECF No. 44 at 13.  This ground was raised in Davidson's direct appeal. Ex. 40, ECF

9 No. 11-13 at 55.  The Supreme Court of Nevada held that "Davidson's right to a speedy trial was

10 not violated." Ex. 44, ECF No. 12-3 at 4 n.1.  As this ground was denied on the merits by the

11 Supreme Court of Nevada without analysis, the question here is whether Davidson has shown

12 that there was no reasonable basis for that ruling. *See Harrington*, 562 U.S. at 98.

13      Although the right to a speedy trial is "one of the most basic rights preserved by our

14 Constitution," *Klopfer v. North Carolina,* 386 U.S. 213, 226 (1967), there is no fixed measure to

15 determine when the right has been violated.  Rather, "any inquiry into a speedy trial claim

16 necessitates a functional analysis of the right in the particular context of the case." *Barker v.*

17 *Wingo*, 407 U.S. 514, 522 (1972); *see also Beavers v. Haubert*, 198 U.S. 77, 87 (1905) ("The

18 right of a speedy trial is necessarily relative. It is consistent with delays and depends upon

19 circumstances.").  In determining whether a defendant's right to a speedy trial has been violated,

20 a balancing test is used, "in which the conduct of both the prosecution and the defendant are

21 weighed." *Barker*, 407 U.S. at 530.  The primary factors to be considered in this balancing test

22 are the "[l]ength of [the] delay, the reasons for the delay, the defendant's assertion of his right,

23

---

[3] Ground 6 was dismissed from this action. ECF No. 37.

and prejudice to the defendant." *Id.* The first factor, "[t]he length of the delay[,] is to some extent a triggering mechanism. Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance." *Id.*

The delay in this case was two years, one month, and eight days, from July 6, 2004, when the original criminal complaint was filed (*see* Ex. 2, ECF No. 10-2) to August 14, 2006, when Davidson's trial commenced (*see* Ex. 26, ECF No. 10-26). This is enough delay to bring the other *Barker* factors into play. *See Doggett v. United States,* 505 U.S. 647, 652 n.1 (1992) (holding that delays approaching one year are presumptively prejudicial); *see also United States v. Beamon*, 992 F.2d 1009, 1014 (9th Cir. 1993) (noting that the 17-month and 20-month delays in that case were only five to eight months longer than the one-year benchmark that triggers the speedy trial inquiry under *Barker*); *United States v. Vassell*, 970 F.2d 1162, 1164 (2d Cir. 1992) (finding a general consensus that around eight months is presumptively prejudicial).

Davidson was arraigned on August 23, 2004. Ex. 5, ECF No. 10-5. At that time, he invoked his right to a speedy trial, and his trial was scheduled for October 18, 2004. *Id.* On October 12, 2004, Davidson's counsel requested a continuance, and the trial was reset for December 13, 2004. Ex. 1, ECF. No. 10-1 at 5. On December 7, 2004, Davidson's counsel advised that he was not prepared, and the trial was reset for February 22, 2005. *Id.* at 7. On February 10, 2005, an amended information was filed, the state district court granted Davidson's motion for a psychological evaluation and the State's motion to compel a handwriting sample, and the trial date was vacated. *Id.* at 10. On March 2, 2005, Davidson's counsel indicated that Davidson was "contemplating hiring private counsel." *Id.* at 15. On March 10, 2005, Davidson's counsel indicated that Davidson could not afford to hire private counsel, so the trial was reset for May 23, 2005. *Id.* at 17. On May 17, 2005, Davidson's counsel indicated that "both sides have

agreed to a continuance," and the trial was reset for October 10, 2005. *Id.* at 18.  On October 4, 2005, the trial was reset for February 21, 2006, "[a]t the request of [c]ounsel" due, in part, to the briefing on Davidson's motion to suppress not being completed. *Id.* at 23.  On December 12, 2005, the state district court held an evidentiary hearing on Davidson's motion to suppress and motion to compel psychiatric examination. *Id.* at 30.  On February 14, 2006, Davidson's counsel "stated there was a scheduling conflict," and the trial date was vacated. *Id.* at 37.  On March 8, 2006, the trial was reset for June 19, 2006. *Id.* at 42.  On April 21, 2006, the state district court held an evidentiary hearing on Davidson's motion to suppress. *Id.* at 44.  On June 15, 2006, the trial was reset for August 14, 2006, "[f]ollowing statements by [c]ounsel and the State." *Id.* at 47.

Although the length of the delay was extensive and Davidson did invoke his right to a speedy trial, those two factors alone do not compel a finding that Davidson was deprived of his right to speedy trial.  Rather, the reasons for the delay point to an opposite finding: there was no "deliberate attempt[s] to delay the trial in order to hamper the defense," but instead it appears that Davidson's trial was continued at Davidson's counsel's request or for valid reasons which "serve to justify appropriate delay." *Barker*, 407 U.S. at 531.  Davidson argues that he was prejudiced by the delay because it allowed the State more time to collect his inmate request/grievance forms. ECF No. 9 at 24.  But prejudice "should be assessed in the light of the interests of defendants which the speedy trial right was designed to protect." *Barker*, 407 U.S. at 532.  Those interests include "(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired." *Id.*  Davidson fails to demonstrate that any of these interests was impacted.  After weighing the factors, I cannot determine that Davidson was deprived of his right to a speedy trial.  The Supreme Court of Nevada's ruling was not contrary to, or an unreasonable application

of, clearly established federal law as determined by the Supreme Court of the United States, and was not based on an unreasonable determination of the facts in light of the evidence. *See* 28 U.S.C. § 2254(d). I will deny Davidson habeas corpus relief with respect to Ground 7.

**Ground 8A**

In Ground 8A, Davidson claims that his federal constitutional rights were violated when his trial counsel failed to object to the admission of the inmate request/grievance forms. ECF No. 9 at 25. Davidson explains that there was no strategic justification for failing to object: his trial counsel made it clear that he did not contest that Davidson wrote the apology letters, so his trial counsel should have just conceded authorship and negated the need for the forms. *Id.* at 27. This ground was raised in Davidson's state habeas appeal. Ex. 59, ECF No. 12-18 at 14. The Supreme Court of Nevada held as follows:

> Appellant failed to demonstrate prejudice. The inmate request/grievance forms were introduced into evidence for the purpose of comparing appellant's handwriting to the handwriting of apology letters sent to the victims, as appellant was unwilling to provide a natural handwriting sample. While counsel's failure to redact the forms may constitute deficient performance, appellant could not demonstrate that he was prejudiced in light of the overwhelming evidence of guilt. One of the victims positively identified appellant, who was his neighbor, and the other victim and a witness gave descriptions that matched him closely. Appellant confessed to the police that he committed the crimes, and he wrote letters of apology to the victims. Therefore, given this overwhelming evidence, we conclude that the district court did not err in denying this claim.

Ex. 62, ECF No. 13-1 at 3. The ruling of the Supreme Court of Nevada was reasonable.

In *Strickland v. Washington*, the Supreme Court of the United States propounded a two-prong test for analysis of claims of ineffective assistance of counsel requiring, the petitioner to demonstrate (1) that the attorney's "representation fell below an objective standard of reasonableness," and (2) that the attorney's deficient performance prejudiced the defendant such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of

the proceeding would have been different." 466 U.S. 668, 688, 694 (1984). A court considering a claim of ineffective assistance of counsel must apply a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The petitioner's burden is to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. And, to establish prejudice under *Strickland*, it is not enough for the habeas petitioner "to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. Rather, the errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687.

Where a state district court previously adjudicated the claim of ineffective assistance of counsel under *Strickland*, establishing that the decision was unreasonable is especially difficult. *See Harrington*, 562 U.S. at 104-05. In *Harrington*, the Supreme Court instructed:

> Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both "highly deferential," [*Strickland*, 466 U.S. at 689]; *Lindh v. Murphy*, 521 U.S. 320, 333, n.7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), and when the two apply in tandem, review is "doubly" so, *Knowles*[ *v. Mirzayance*, 556 U.S. 111, 123 (2009)]. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. 556 U.S., at 123, 129 S.Ct. at 1420. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonably argument that counsel satisfied *Strickland*'s deferential standard.

*Harrington*, 562 U.S. at 105; *see also Cheney v. Washington*, 614 F.3d 987, 995 (9th Cir. 2010) ("When a federal court reviews a state court's *Strickland* determination under AEDPA, both AEDPA and *Strickland*'s deferential standards apply; hence, the Supreme Court's description of the standard as 'doubly deferential.'").

In analyzing a claim of ineffective assistance of counsel under *Strickland*, a court may first consider either the question of deficient performance or the question of prejudice; if the petitioner fails to satisfy one element of the claim, the court need not consider the other. *See Strickland*, 466 U.S. at 697.

I held in Ground 1 that the inmate request/grievance forms were admitted for the permissible purpose of showing the basis of the handwriting analysis expert's opinion that Davidson wrote the two apology letters. Therefore, it was not deficient performance for Davidson's trial counsel to not have objected to the forms. *See Morris v. California*, 966 F.2d 448, 456 (9th Cir. 1991) ("We need not determine the actual explanation for trial counsel's failure to object, so long as his failure to do so falls within the range of reasonable representation."). However, because the forms contained information concerning Davidson's desire to be in addiction and violence prevention classes, along with information that Davidson was subdued after a fight in the jail and the implied fact that Davidson had been incarcerated previously, *see* Ex. 81, ECF No. 13-20 at 3-6, 8-29, 30-51, 53, it would have been reasonable for Davidson's counsel to have sought redaction of the forms.

Although Davidson's trial counsel's failure to request redaction of the forms may amount to "representation [that] fell below an objective standard of reasonableness," Davidson must also demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 688, 694. Davidson fails to meet this burden. As the Supreme Court of Nevada stated, there was overwhelming evidence of guilt presented at Davidson's trial. *See* Ex. 62, ECF No. 13-1 at 3. Not only did Davidson confess to the crimes (*see* Ex. 16, ECF No. 10-16 at 14-43), but his trial counsel conceded during closing argument that Davidson wrote apology letters to the victims.

Ex. 30, ECF No. 11-3 at 16, 20 ("We've never contested that Roderick wrote these letters. If you remember, I didn't have any questions for the handwriting expert about the letters themselves."). And without a showing that the jury even considered the undesirable information in the forms, Davidson cannot demonstrate that the result of his trial would have been different with the redaction. *See* Ex. 29, ECF No. 11-2 at 11-14, 37-49 (demonstrating that when the State introduced the forms and admitted them into evidence, it did not touch upon the contents of the forms; rather, it only discussed the handwriting on the forms). As Davidson fails to demonstrate prejudice, the Supreme Court of Nevada's ruling was not contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, and was not based on an unreasonable determination of the facts in light of the evidence. *See* 28 U.S.C. § 2254(d). I will deny Davidson habeas corpus relief with respect to Ground 8A.

### Grounds 8B and 9A

In Ground 8B, Davidson claims that his federal constitutional rights were violated when his trial counsel failed to object to a flight instruction. ECF No. 9 at 28. Davidson explains that he did not run to another jurisdiction or attempt to flee in any way other than necessary to accomplish the crime itself. *Id.* In Ground 9A, Davidson claims his federal constitutional rights were violated when his appellate counsel failed to include a ground in his direct appeal concerning the alleged improper flight instruction. *Id.* at 30. These grounds were raised in Davidson's state habeas appeal. Ex. 59, ECF No. 12-18 at 19. With regard to Davidson's trial counsel's alleged deficient performance, the Supreme Court of Nevada held as follows:

> Appellant failed to demonstrate that trial counsel's performance was deficient or that he was prejudiced. A witness testified that she saw someone who looked like appellant leave the victim's house in the victim's car at the time the victim was attacked and robbed. Thus, the flight instruction was supported by evidence, and counsel was not deficient for failing to object to the instruction. *See Weber v. State*, 121 Nev. 554, 581-82, 119 P.3d 107, 126 (2005). Moreover, in light of the

overwhelming evidence against him appellant failed to demonstrate prejudice. Therefore, the district court did not err in denying this claim.

Ex. 62, ECF No. 13-1 at 3.  With regard to Davidson's appellate counsel's alleged deficient performance, the Supreme Court of Nevada held that Davidson "failed to demonstrate that counsel's performance was deficient or that he was prejudiced." *Id.* at 4-5.  These rulings of the Supreme Court of Nevada were reasonable.

The flight instruction in question provided:

The flight of a person immediately after the commission of a crime, or after he is accused of a crime, is not sufficient in itself to establish his guilt, but is a fact which, if proved, may be considered by you in light of all other proved facts in deciding the question of his guilt or innocence. Whether or not evidence of flight shows a consciousness of guilt and the significance to be attached to such a circumstance are matters for your deliberation.

Ex. 34, ECF No. at 11-7 at 23.

Garvin testified that Davidson "took the money and the keys and took my car and drove away." Ex. 27, ECF No. 11 at 19.  Similarly, Spencer testified that after Davidson battered him, Davidson "walked out and pulled the door shut behind him" and "left in my truck." *Id.* at 93.  Importantly, during his confession, Davidson also states that he fled after the two attacks. *See* Ex. 16, ECF No. 10-16 at 17 (statement of Davidson explaining that he took Garvin's keys, drove Garvin's car away from the scene, and then left the car at some projects), at 31 (statement of Davidson explaining that he drove Spencer's truck away from the scene).  Thus, there is evidence that Davidson fled with consciousness of guilt and to evade arrest. *See Walker v. State*, 113 Nev. 853, 870-71, 944 P.2d 762, 773 (1997).  It is apparent that Davidson left the crime scenes in the quickest way possible—using the victims' vehicles—to avoid the police being called and arresting him.  Accordingly, there was evidence presented at Davidson's trial

warranting the flight instruction under Nevada caselaw, so Davidson's trial counsel was not

deficient in failing to object to the instruction. *See Potter v. State*, 96 Nev. 875, 875-76, 619 P.2d

1222, 1222 (1980) ("The giving of [a flight] instruction is not error if evidence of flight has been

admitted."); *see also Karis v. Calderon*, 283 F.3d 1117 (9th Cir. 2002) ("Instructional error will

not support a petition for federal habeas corpus relief unless it is shown 'not merely that the

instruction is undesirable, erroneous, or even universally condemned,' but that by itself the

instruction 'so infected the entire trial that the resulting conviction violates due process.'"

(quoting *Cupp v. Naughten*, 414 U.S. 141, 146-47 (1973)).

Even if Davidson's trial counsel's failure to object to the instruction amounted to a

deficient performance, Davidson must also demonstrate that "there is a reasonable probability

that, but for counsel's unprofessional errors, the result of the proceeding would have been

different." *Strickland*, 466 U.S. at 694. The instruction specifically cautioned the jury not to

infer Davidson's guilt from flight alone. *See* Ex. 34, ECF No. at 11-7 at 23 ("[F]light . . . is not

sufficient in itself to establish his guilt."). Therefore, the jury necessarily had to rely on other

evidence in order to find Davidson guilty, so Davidson fails to demonstrate that absent the flight

instruction, the result of his trial would have been different.

I turn briefly to Davidson's argument that his appellate counsel failed to include a ground

in his direct appeal regarding the flight instruction. Davidson "must first show that his counsel

was objectively unreasonable . . . in failing to find arguable issues on appeal—that is, that

counsel unreasonably failed to discover nonfrivolous issues and to file a merits brief raising

them." *Smith v. Robbins*, 528 U.S. 259, 285 (2000). If Davidson is successful in meeting that

burden, "he then has the burden of demonstrating prejudice. That is, he must show a reasonable

probability that, but for counsel's unreasonable failure to file a merits brief, he would have

prevailed on his appeal." *Id.* Because evidence was presented at Davidson's trial warranting the

flight instruction, I cannot determine that Davidson's appellate counsel was objectively

unreasonable in not including this ground in Davidson's direct appeal. In fact, Davidson's

appellate counsel was successful in reversing a portion of Davidson's judgment. *See* Ex. 44, ECF

No. 12-3 (the Supreme Court of Nevada's holding that one count of robbery was a double-

jeopardy violation and one count of battery should be a misdemeanor, not a felony). So it was

reasonable for Davidson's appellate counsel to have left out this frivolous argument in order to

highlight better ones. *See Jones v. Barnes*, 463 U.S. 745, 753 (1983) ("A brief that raises every

colorable issue runs the risk of burying good arguments.").

Because Davidson's trial counsel's actions in not objecting to the flight instruction and

his appellate counsel's actions in not including a ground regarding the flight instruction in his

direct appeal did not "f[a]ll below an objective standard of reasonableness," *Strickland*, 466 U.S.

at 688, the Supreme Court of Nevada's rulings were not contrary to, or an unreasonable

application of, clearly established federal law as determined by the Supreme Court of the United

States, and were not based on an unreasonable determination of the facts in light of the evidence.

*See* 28 U.S.C. § 2254(d). I will deny Davidson habeas corpus relief with respect to Grounds 8B

and 9A.[4]

**Grounds 8C and 9B**

In Ground 8C, Davidson claims that his federal constitutional rights were violated when

his trial counsel failed to object when the State vouched for the credibility of two witnesses. ECF

[4]Davidson also argues that the flight instruction framed the question for the jury to decide guilt
or innocence, but it should have been reasonable doubt as to guilt. ECF No. 9 at 28. This
argument lacks merit. This same instruction was evaluated in *Karis v. Calderon*, and it was
found not to have violated due process. 283 F.3d 1117, 1131-32 (9th Cir. 2002).

No. 9 at 28.  The Respondents argue that the prosecutor was merely making fair comments about the state of the evidence presented at trial. ECF No. 44 at 16.  In Ground 9B, Davidson claims that his federal constitutional rights were violated when his appellate counsel failed to include a ground concerning improper vouching in his direct appeal. ECF No. 9 at 31.

These grounds were raised in Davidson's state habeas appeal. Ex. 59, ECF No. 12-18 at 20.  With regard to Davidson's trial counsel's alleged deficient performance, the Supreme Court of Nevada held:

> Appellant failed to demonstrate that his trial counsel's performance was deficient because the prosecutor did not improperly vouch for the credibility of the witnesses. *Browning v. State*, 120 Nev. 347, 359, 91 P.3d 39, 48 (2004) (recognizing that the prosecutor improperly vouches for a witness when the prosecutor "places the prestige of the government behind the witness" (internal quotations omitted)).  Further, appellant failed to demonstrate that there was a reasonable probability of a different outcome at trial given the overwhelming evidence of guilt.  Therefore, we conclude that the district court did not err in denying this claim.

Ex. 62, ECF No. 13-1 at 4.  With regard to Davidson's appellate counsel's alleged deficient performance, the Supreme Court of Nevada held that Davidson "failed to demonstrate that counsel's performance was deficient or that he was prejudiced." *Id.* at 4-5.  These rulings were reasonable.

During its closing argument, the State argued that "Ms. Stowe was totally honest with you and told you: [l]ook, I didn't see his face, but I thought it was [Davidson]." Ex. 30, ECF No. 11-3 at 6, 23-24.  The State also argued that "[Spencer] told you, and you saw him on the stand, and he was credible." *Id.* at 24.

"Vouching consists of placing the prestige of the government behind a witness through personal assurances of the witness's veracity, or suggesting that information not presented to the jury supports the witness's testimony." *United States v. Necoechea*, 986 F.2d 1273, 1276 (9th

Cir. 1993); *see also United States v. Young*, 470 U.S. 1, 8-9 (explaining that the prosecutor "must refrain from injecting personal beliefs into the presentation of [the] case"). Several factors are assessed in determining whether improper vouching occurred:

> the form of vouching; how much the vouching implies that the prosecutor has extra-record knowledge of or the capacity to monitor the witness's truthfulness; any inference that the court is monitoring the witness's veracity; the degree of personal opinion asserted; the timing of the vouching; the extent to which the witness's credibility was attacked; the specificity and timing of a curative instruction; the importance of the witness's testimony and the vouching to the case overall.

*Necoechea*, 986 F.2d at 1278.

The extent of the State's comments about Stowe and Spencer were minimal. *See United States v. Younger*, 398 F.3d 1179, 1190 (9th Cir. 2005) (holding that a single improper statement did not materially affect the verdict). The State merely commented that Stowe was "honest," and Spencer was "credible." Ex. 30, ECF No. 11-3 at 6, 23-24. Accordingly, the degree of vouching was nominal, such that the statements did not rise to the level of improper vouching.

Because there was no improper vouching, Davidson's trial counsel's actions in not objecting to the comments and his appellate counsel's actions in not including a ground of improper vouching on appeal did not "f[a]ll below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. Therefore, the Supreme Court of Nevada's rulings were not contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, and were not based on an unreasonable determination of the facts in light of the evidence. *See* 28 U.S.C. § 2254(d). I will deny Davidson habeas corpus relief with respect to Grounds 8C and 9B.

**Grounds 8D and 9C**

In Ground 8D, Davidson claims that his federal constitutional rights were violated when his trial counsel failed to object to the reasonable doubt instruction. ECF No. 9 at 29.  Davidson contends the instruction minimized the State's burden of proof, as it inflated the constitutional standard of doubt necessary for acquittal. *Id.*  In Ground 9C, Davidson claims his federal constitutional rights were violated when his appellate counsel failed to include a ground concerning the reasonable doubt instruction in his direct appeal. *Id.* at 31.  The Respondents argue that the state district court gave the instruction that is required by statute, which demonstrates that a challenge to the reasonable doubt instruction would have failed on appeal. ECF No. 44 at 19.

These grounds were raised in Davidson's state habeas appeal. Ex. 59, ECF No. 12-18 at 21.  With regard to Davidson's trial counsel's alleged deficient performance, the Supreme Court of Nevada held that "[a]ppellant failed to demonstrate that counsel's performance was deficient or that he was prejudiced, as he received the instruction required by NRS 175.211.  Thus, we conclude that the district court did not err in denying this claim." Ex. 62, ECF No. 13-1 at 4.  With regard to Davidson's appellate counsel's alleged deficient performance, the Supreme Court of Nevada held that Davidson "failed to demonstrate that counsel's performance was deficient or that he was prejudiced." *Id.* at 4-5.  I find that these rulings were reasonable.

The reasonable doubt instruction stated:

> The Defendant is presumed innocent until the contrary is proved.  This presumption places upon the State the burden of proving beyond a reasonable doubt every material element of the crime charged and that the Defendant is the person who committed the offense.

> A reasonable doubt is one based on reason.  It is not mere possible doubt but is such a doubt as would govern or control a person in the more weighty affairs of life.  If the minds of the jurors, after the entire comparison and consideration of all the evidence, are in such a condition that they can say they

feel an abiding conviction of the truth of the charge, there is not a reasonable doubt. Doubt to be reasonable must be actual, not mere possibility or speculation.

If you have a reasonable doubt as to the guilt of the Defendant, he is entitled to a verdict of not guilty.

Ex. 34, ECF No. 11-7 at 21.

This reasonable doubt jury instruction was nearly identical[5] to the reasonable doubt instruction analyzed in *Ramirez v. Hatcher*, 136 F.3d 1209, 1210-11 (9th Cir. 1998). And in *Ramirez*, the instruction was found to not "unconstitutionally misstate the concept of reasonable doubt." *Id.* at 1214. Because the jury instruction was proper, Davidson's trial counsel's actions in not objecting to the instruction and his appellate counsel's actions in not including a ground regarding the jury instruction on appeal did not "f[a]ll below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. Therefore, the Supreme Court of Nevada's rulings were not contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, and were not based on an unreasonable determination of the facts in light of the evidence. *See* 28 U.S.C. § 2254(d). I will deny Davidson habeas corpus relief with respect to Grounds 8D and 9C.

### Ground 8E

In Ground 8E, Davidson claims that the cumulative effect of his trial counsel's errors prejudiced him and violated his federal rights. ECF No. 9 at 29. This ground was raised in

---

[5]The only difference between the reasonable doubt instruction provided in Davidson's trial and the reasonable doubt instruction provided in *Ramirez* was the omission of the word "substantial." *Compare* Ex. 34, ECF No. 11-7 at 21 ("Doubt to be reasonable must be actual, not mere possibility or speculation. . . ."), *with Ramirez v. Hatcher*, 136 F.3d 1209, 1210-11 (9th Cir. 1998) ("Doubt to be reasonable must be actual *and substantial*, not mere possibility or speculation. . . .") (emphasis added). However, because "the use of the term 'substantial' to describe reasonable doubt has been disfavored," *Ramirez*, 136 F.3d at 1212, the reasonable doubt instruction provided in Davidson's trial was even more acceptable than the reasonable doubt instruction in *Ramirez*.

Davidson's state habeas appeal. Ex. 59, ECF No. 12-18 at 22. The Supreme Court of Nevada held that Davidson "has not demonstrated prejudice resulting from the cumulative effect of any deficiencies in counsel's representation." Ex. 62, ECF No. 13-1 at 5. The only possible error committed by Davidson's trial counsel was not moving to redact certain portions of the inmate request/grievance forms. However, because there were no other errors to accumulate, the Supreme Court of Nevada's ruling was not contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, and was not based on an unreasonable determination of the facts in light of the evidence. *See* 28 U.S.C. § 2254(d). I will deny Davidson habeas corpus relief with respect to Ground 8E.

**Ground 9D**

In Ground 9D, Davidson claims that the cumulative effect of his appellate counsel's errors prejudiced him and violated his federal rights. ECF No. 9 at 32. This ground was raised in Davidson's state habeas appeal. Ex. 59, ECF No. 12-18 at 22. The Supreme Court of Nevada held that Davidson "has not demonstrated prejudice resulting from the cumulative effect of any deficiencies in counsel's representation." Ex. 62, ECF No. 13-1 at 5. Davidson has failed to demonstrate any errors on the part of his appellate counsel. Therefore, because there are no errors to consider cumulatively, the Supreme Court of Nevada's ruling was not contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, and was not based on an unreasonable determination of the facts in light of the evidence. *See* 28 U.S.C. § 2254(d). I will deny Davidson habeas corpus relief with respect to Ground 9D.

////

////

**Certificate of Appealability**

The issuance of a certificate of appealability requires a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c). "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *see also James v. Giles*, 221 F.3d 1074, 1077-79 (9th Cir. 2000). A certificate of appealability is unwarranted in this case.

**CONCLUSION**

It is therefore ordered that the First Amended Petition for Writ of Habeas Corpus by a Person in State Custody Pursuant to 28 U.S.C. § 2254 **(ECF No. 9) is denied**.

It is further ordered that the Petitioner is denied a certificate of appealability.

It is further ordered that, pursuant to Federal Rule of Civil Procedure 25(d), the Clerk of Court is directed to substitute Jerry Howell for Dwight Neven as the Respondent warden on the docket for his case.

It is further ordered that the Clerk of the Court is directed to enter judgment accordingly.

Dated: September 11, 2019.

_____
ANDREW P. GORDON
UNITED STATES DISTRICT JUDGE